SIGNED THIS: December 16, 2025

_____
**Peter W. Henderson**
**Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In re:<br><br>ROBERT J. LITTMANN, SR.,<br><br>      Debtor. | Case No. 22-80024 |
| OBERY FARMS PARTNERSHIP,<br>ROBERT SPRINGER, JAY SPRINGER,<br>and NORMAN SCHIRER,<br><br>      Plaintiffs,<br><br>v.<br><br>ROBERT J. LITTMANN, SR.,<br><br>      Defendant. | Adv. No. 22-8001 |

**OPINION**

Four farmers lent money to Robert J. Littmann, Sr., and his companies. They were not repaid, so they sued in state court. Littmann personally invoked the protection of bankruptcy, but the lawsuit continued against the companies, and the farmers obtained a judgment. Littmann then falsified a security agreement that supported a false lien against the only valuable assets of the companies. The security agreement was provided to both the farmers in state court, as they sought to collect on their judgment, and the trustee in bankruptcy, as he attempted to ascertain Littmann's financial condition. As a result, the parties engaged in protracted litigation and the estate remained open before the false lien was terminated and the assets liquidated.

The farmers now move for summary judgment that Littmann is not entitled to a Chapter 7 discharge in his bankruptcy case because he falsified recorded information. 11 U.S.C. §727(a)(3). There is no genuine dispute that Littmann falsified the security agreement, among other documents. His explanation—that he believed a secured debt actually existed—is legally insufficient to justify fabricating evidence of that belief. The motion will therefore be granted, and Littmann shall not receive a discharge.

**I.     Background**

The four farmers-plaintiffs in this adversary case—Obery Farms Partnership, Robert Springer, Jay Springer, and Norman Schirer—all lent money to Littmann and his businesses. Littmann was the sole shareholder, president, and sole director of Waterscience, Inc. (WSI), a Delaware corporation, and Water Science Biotechnology, Inc. (WSB), an Illinois corporation. Littmann was also the majority shareholder, president, and sole director of Industrial Waste Elimination, Inc. (IWE) and Agriscience, Inc. (ASI), both Delaware corporations.

The financial relationship between the farmers and Littmann began in 2017, when they lent money under convertible promissory notes executed by Littmann and IWE as joint borrowers. The next year the parties agreed to revise the notes so that Littmann and WSI were the joint borrowers. The notes were later amended to be secured by the assets of WSI, and a UCC filing was made in Delaware in 2018. Later notes executed by the parties in 2019 and 2020 were also made subject to that UCC filing. In total, the farmers lent IWE/WSI and/or Littmann $450,000, including $50,000 in personal (non-convertible) notes.

2

In early 2021, the farmers entered into settlement agreements with Littmann and IWE, WSI, and WSB for immediate repayment of the amounts due to the farmers. Neither Littmann nor his companies complied with the agreements, so about three weeks later the farmers sued them in the Tenth Judicial Circuit Court of Illinois (Peoria County). The parties entered into a consent decree in June 2021 that required those defendants to pay the farmers within 7 days as follows:

- Obery Farms Partnership: $177,486.29
- Robert Springer: $223,216.83
- Jay Springer: $58,118.74
- Norman Schirer: $57,691.23

In return, the farmers agreed to return or destroy confidential information they possessed and to terminate their UCC financing statements, among other things. The consent decree "resolve[d] all disputes between the Parties and terminate[d] the litigation between them."

But were that so. Neither Littmann nor his companies complied with the consent decree. The farmers returned to state court in July 2021 and asked it to hold the defendants in indirect civil contempt for their failure to repay the amounts due. That led to Littmann filing an individual Chapter 7 bankruptcy petition on January 26, 2022, which stayed the state case against him. The companies did not file for bankruptcy, though, and on January 27, 2022, the state court entered a judgment against them in favor of the farmers in the amounts above, plus interest, attorney fees, and costs.

At that time, the only valuable assets in the four companies were trademarks and patents owned by WSI. Otherwise, the companies were out of business and their stock worthless. Littmann valued his equity in each company at $0.

Littmann maintained in both courts that WSI's intellectual property was wholly encumbered by a lien held by The Eleanor Dickinson Group, LLC (EDG). In the weeks following his bankruptcy filing, Littmann falsified several documents to that effect (described in detail below). On March 4, 2022, EDG filed, with Littmann's cooperation, a UCC financing statement in Delaware to encumber the WSI assets. The Chapter 7 Trustee was alerted to the filing two weeks later, at the first meeting of creditors, and the same day filed a no-asset report abandoning the bankruptcy estate's interest in any of Littmann's property, including his equity in WSI. About a month later, the Trustee

3

withdrew the report after he was "informed that the documents submitted by the Debtor to support the valuation of his businesses (including secured debt) may have been inaccurate and/or incomplete."

In state court, the farmers were convinced that Littmann had engineered a false security interest in the WSI's IP so that he could, with the help of a friendly creditor (EDG), shield it from their collection efforts. Pursuant to their citations to discover assets, the farmers sought information from Littmann (in his capacity as corporate director) concerning his companies' relationship with EDG and the origin of its purported security interest. In October 2022, EDG threw in the towel and terminated its financing statement, leaving the farmers as WSI's only secured creditors. The assets were then sold and the proceeds applied to the farmers' claims. The proceeds were not enough to cover the entire debt owed to the farmers. With no assets remaining in WSI, the Chapter 7 Trustee again abandoned the estate's interest in Littmann's corporate equity and filed a no-asset report in October 2024.

This adversary case was filed because the farmers believe that they were cheated and that Littmann abused the bankruptcy system as part of his malfeasance. They complain that their debts are nondischargeable, 11 U.S.C. §523(a) (Counts I, II, and III), and that Littmann is not entitled to a discharge, 11 U.S.C. §727(a) (Counts IV and V). They move here for summary judgment only on Count IV, which alleges that Littmann falsified and concealed recorded information from which his financial condition or business transactions might be ascertained. 11 U.S.C. §727(a)(3).

The district court has jurisdiction under 28 U.S.C. §1334 and has referred the matter to this Court pursuant to 28 U.S.C. §157(a). CDIL LR 40.2(A). This is a core proceeding. 28 U.S.C. §157(b)(2)(J). The matter stems from the debtor's bankruptcy itself and may be constitutionally adjudicated by this Court. See *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## II.    Legal standards

Relief under the Bankruptcy Code is reserved for the "honest but unfortunate debtor." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 715 (2018). "[T]he privilege of discharge depend[s] on a *true* presentation of the debtor's financial affairs." *Matter of Scott*, 172 F.3d 959, 969 (7th Cir. 1999) (emphasis added). Section 727 of the Code

provides a "blunt remedy"—complete denial of discharge—for actions that hinder the entire bankruptcy process. *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355, 364 (2016).

### A. Summary judgment

Summary judgment shall be granted if the plaintiffs show that there is no genuine dispute as to any material fact and the plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), as applied by Fed. R. Bankr. P. 7056. A genuine issue of material fact exists if a reasonable trier of fact could look at the evidence and find for the non-moving party (here, Littmann). *Gaines v. Dart*, 158 F.4th 829, 834 (7th Cir. 2025). All reasonable inferences are therefore drawn in favor of the non-moving party. *Mims v. City of Chicago*, 155 F.4th 970, 974 (7th Cir. 2025). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Section 727(a)(3) requires a debtor to provide a complete and accurate picture of their financial condition or business transactions.

Section 727(a)(3) focuses on actions that hinder the ability to ascertain the debtor's financial condition. A debtor will not receive a discharge if they have

> concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained[.]

11 U.S.C. §727(a)(3). A debtor who was "justified" in doing so, however, "under all of the circumstances of the case," may still receive a discharge. *Id*. Section 727(a)(3) ensures that debtors provide enough information to permit others to ascertain their financial condition and to track their financial dealings with "substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002).

### 1. History

Section 727(a)(3) has been a part of American bankruptcy law in substantially its current form since 1926. The original Bankruptcy Act of 1898 had proscribed a discharge for a debtor who, with intent to conceal his financial condition, "destroyed, concealed, or failed to keep books of account or records from which his true condition might be ascertained." Bankruptcy Act of 1898, §14b(2), 30 Stat. 550 (1898). A 1926 amendment added "mutilated" and "falsified" into the list of prohibited acts relating to books of account or records. 44 Stat. 663 (1926). Adding those two terms might not have been strictly necessary, since the Bankruptcy Act at all times defined the term "conceal" to include "secrete, falsify, and mutilate." 30 Stat. 545 (1898); see 11 U.S.C. §1(7) (1976). (That definition of "conceal" did not make it into the 1978 Code.)

More significantly, the 1926 amendment removed the "intent to conceal" element, thus "stiffening" the requirements for discharge. J. McLaughlin, *Amendment of the Bankruptcy Act*, 40 Harv. L. Rev. 341, 351 n.41 (1927). The American Bar Association's Special Committee on Practice in Bankruptcy Matters, which was largely responsible for drafting the amendment, had proposed the change for the following reasons:

> The law, as it now stands … is believed to be, and has been criticized as too broad in some respects, and too narrow in others. It does not, for instance, allow of any explanation or justification for the mere failure to keep books of account, although, in some cases, mitigating circumstances may exist which should not deprive an honest debtor of his discharge on that score.
>
> The amendment is intended to make the provision reasonable and capable of just application by the court, under all the circumstances of a given case[.]

Report of the Special Committee on Practice in Bankruptcy Matters, 48 Annu. Rep. A.B.A. 478, 483–84 (1925). For the past hundred years, then, what is now §727(a)(3) has permitted objecting parties to prove their *prima facie* case without needing to offer evidence of the debtor's intent; but it has also relieved debtors of an overly harsh consequence for innocent or otherwise justifiable mistakes according to all the circumstances of the case. The statute "lodges in the bankruptcy court a reasonably

6

wide judicial discretion" in determining whether the debtor was justified in acting as they did. *Matter of Marx*, 125 F.2d 335, 336–37 (7th Cir. 1942).

### 2. Defining the prohibited acts

The foregoing makes it clear that all five acts in §727(a)(3)—conceal, destroy, mutilate, falsify, or fail to keep or preserve—are prohibited because they inhibit a true presentation of the debtor's financial condition. See *Scott*, 172 F.3d at 969. The "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Stamat v. Neary*, 635 F.3d 974, 983 (7th Cir. 2011). There are obvious differences between some of the acts; "destroying" records can easily be distinguished from "falsifying" records. But there is also substantial overlap, as the old Bankruptcy Act definition of "conceal" suggests. See also *In re Helfgott*, 245 F. 358 (S.D.N.Y. 1917) (L. Hand, J.) (finding falsifying books was "of course" a failure to keep true books, thus concealing financial condition). Section 727(a)(3) is best read as describing a spectrum of behavior—on which the five acts lie and sometimes overlap—that is inconsistent with the debtor's duty to make a full and accurate disclosure of their financial condition.

The plaintiffs allege that Littmann "concealed" and "falsified" recorded information, although they focus on falsification. They propose definitions for both terms that Littmann does not gainsay. In a different case, precise definitions of the terms might be necessary, but here it does not matter. There is no legal dispute that what occurred constitutes falsifying or concealing. There is not, for example, any argument that "conceal" or "falsify" carries a special technical meaning that differs from our common understanding of those words. So I interpret the terms to mean just what they suggest: in a broad sense, hiding records or recording false information touching upon matters the debtor is duty-bound to disclose. See *Scott*, 172 F.3d at 967.

### 3. Burdens of proof

The party objecting to the debtor's discharge bears the burden of proof by a preponderance of the evidence. *Id*. at 966–67. The objecting party must prove that (1) the debtor (or someone acting for the debtor) concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, and (2) the recorded information was information from which the debtor's financial condition or business transactions might be ascertained. *Vara v. Crawford (In re Crawford)*, 673 B.R. 793, 804 (Bankr. N.D.

7

Ohio 2025); *Lassman v. Hegarty (In re Hegarty)*, 400 B.R. 332, 341 (Bankr. D. Mass. 2008). Once those elements have been proven, the burden shifts to the debtor to produce evidence that their act or failure to act was justified under the circumstances of the case. *Matter of Martin*, 698 F.2d 883, 887 (7th Cir. 1983).

"[T]he important change is that since 1926 no moral obliquity need be shown." *White v. Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941). The objecting party need not prove the debtor's intent. *Scott*, 172 F.3d at 969. But that intent may be probative, under "all of the circumstances of the case," in determining whether the debtor was justified in acting as they did. A debtor who acted based on "simple negligence or innocent misunderstandings" may well show their actions to be justified, whereas a debtor who acted with intent to deceive will find it hard, if not impossible, to justify their actions. Cf. *Matter of Chlad*, 922 F.3d 856, 862–63 (7th Cir. 2019). The point is that the debtor shoulders the burden of proving their nonculpable intent if they believe it to be relevant.

### III.  The Debtor, without justification, falsified or concealed recorded information from which his financial condition might be ascertained.

Littmann falsified a document purporting to grant a security interest in WSI's intellectual property to EDG. That false document served as the basis for several other documents that necessarily contained false information. Combined, they made the bankruptcy and state court procedures more expensive and time-consuming. His acts fit squarely within the proscriptions of §727(a)(3), and he has failed to provide a legally sufficient explanation to justify his acts.

#### A.  Littmann falsified recorded information.

The intellectual property owned by WSI was the focus of the parties' dispute. Littmann swears that he believes and understands that WSI was indebted to EDG to the tune of $4+ million and that the debt was secured by a lien on the patents and trademarks. The primary evidence he produced in support, to both the Chapter 7 Trustee and the plaintiffs, was a document entitled, "First Lien Intellectual Property Security Agreement." That document was a fabrication. Other documents followed, all perpetuating the falsity that WSI owed a significant secured debt to EDG. Littmann falsified the documents, either by himself or with the cooperation of others.

8

### 1.   The Security Agreement was falsified.

There is no genuine dispute that Littmann falsified the Security Agreement. Littmann admits nearly all the observations the plaintiffs make about its fabrication. Suppl. Response ¶¶ 5[a], 6; Motion ¶¶ 90–97, 99. He denies only that the documents referenced in the Security Agreement (discussed in f., below) never existed. That denial does not create a genuine issue of material fact. Summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Littmann has offered no explanation or evidence that would permit a reasonable trier of fact to find that the Security Agreement is anything but a falsification for which he is responsible.

a.   Three versions of the Security Agreement exist in the record. The first, identified as Plaintiff's Exhibit 15, is unsigned. It was created on February 25, 2022, at 8:56 a.m. (see b., below). Littmann emailed that version as a pdf to his bankruptcy attorney, who then forwarded it to the Chapter 7 Trustee and to plaintiffs' counsel on May 17, 2022. Littmann's email was in response to the Trustee's question as to whether there had been any "contract assigning any intellectual property other than the patents to any other entities." Pl. Exh. 6; Pl. Exh. 5 at 38–40.

The second version, located within Plaintiff's Exhibit 29, is signed only by Littmann. That version was emailed from Littmann to Robert Wilson on February 25, 2022, at 3:23 p.m. (Wilson performed accounting services for WSI, IWE, and WSB as their Chief Financial Officer.)

The third and final version, Plaintiff's Exhibit 18, is signed by Littmann and William Harry Whitt, managing member of EDG. Littmann's signatures on the final version are identical to those on the half-signed version he sent to Wilson.

b.   The Security Agreement has a header, consistent with being printed from an internet browser, that lists the time and date of printing. Page 2 discloses the time and date as February 25, 2022, at 8:56 a.m. The pdf's metadata shows that the unsigned version of the document was created on February 25, 2022, at 8:56 a.m. Littmann does not attempt to explain those facts away; it is undisputed that an unsigned version of the document was created on February 25, 2022, at 8:56 a.m.

9

On pages 1, 3, and 4 of the Security Agreement, the header contains the same time but a different date: February 15, 2017. Because it is undisputed that the document was created on February 25, 2022, the February 15, 2017 date was falsified.

c. Littmann emailed the partially signed copy of the agreement on February 25, 2022, at 3:23 p.m., to Wilson. That version did not contain Whitt's signature, which must have been added on or after February 25, 2022. Littmann provides no evidence or explanation to permit any inference in his favor. Why did he forward a half-signed version of a document purportedly executed five years before, and why did he forward that version on the very same date the unsigned version was created? (His state court testimony was evasive. Pl. Exh. 5 at 57–63.) The only inference a rational trier of fact could draw is that Littmann (or someone at his direction) created the document that morning, falsely backdated it to 2017, and then signed it before forwarding to Wilson. Littmann cannot, and does not, dispute that conclusion.

The last line of the signed Security Agreement states that the agreement is "duly executed and delivered by [each Grantor's] officer thereunto duly authorized as of the date first above written." The date "first above written" is February 15, 2017. Because the document was created on February 25, 2022, that statement is false; the Security Agreement was signed and executed sometime on or after February 25, 2022, not on February 15, 2017.

d. The Security Agreement is identical in most ways to a 2005 document that appears as the first search result on Google for "First Lien Intellectual Property Security Agreement," which of course can be printed from an internet browser. In that 2005 document, five related LLCs granted security interests to Credit Suisse, the "Collateral Agent," and the same chief financial officer signed five different times on five different lines on behalf of each "Grantor" LLC. Credit Suisse did not sign the document because it was not a Grantor.

The unsigned Security Agreement here also has five signature lines, but only three signatories. The partially signed Security Agreement also has five signature lines. The fully signed Security Agreement has only three signature lines, so the document was altered at some point between February 25, 2022, at 3:23 p.m., and the signing of the document by Whitt. In all versions, the document purports to be made "by the Persons listed on the signature pages hereof (collectively, the "*Grantors*") in favor of

10

[EDG], as collateral agent." Yet in both versions the "Grantors" listed on the signature pages include EDG, even though it is the collateral agent, not a grantor.

e.  In fact, EDG – whether known as "Eleanor Dickinson Group LLC" or "The Eleanor Dickinson Group LLC"—did not exist on February 25, 2022. It originally was organized as a Utah limited liability company in April 2014, but it was administratively dissolved in July 2018. EDG was again organized on March 23, 2022, more than a month after the Security Agreement was created. Littmann does not contest those facts but thinks them irrelevant. But a trier of fact would conclude that a document was created in February 2022 to grant a security interest from WSI to an entity that did not exist. That fact is relevant, even if it is not weighty. It is consistent with the many other attributes showing the Security Agreement was falsified.

f.  The Security Agreement, like the 2005 document, refers to a "Credit Agreement," "Letters of Credit," a "Guaranty," "Loan Agreements," and three separate schedules. Littmann, the signatory for both IWE and WSI, was unable to produce any of those documents, even though the Security Agreement was created on February 25, 2022. Littmann denies that the referenced documents did not exist, but mere denials do not create a genuine dispute of material fact. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983). Given the inconsistencies in the document, and their obvious genesis, a reasonable trier of fact could find only that the Security Agreement is an edited version of the 2005 document, and, as such, contains references to documents that never existed in the context of Littmann's business affairs.

The Security Agreement is not a true representation of the grant of a security interest in WSI's intellectual property to EDG as of February 15, 2017. The backdating on pages 1, 3, and 4—but not page 2—is a smoking gun. It allows for no innocent explanation, and none has been offered. It is a falsified document.

### 2.    The 2021 WSI Balance Sheet was falsified.

Two WSI balance sheets are in the record. The first, which purports to represent the balance sheet as of December 31, 2019, is dated July 31, 2020. Pl. Exh. 19. The second, which purports to represent the balance sheet as of December 31, 2021, is dated February 25, 2022, at 6:13 p.m. Pl. Exh. 20. The 2019 balance sheet does not list any secured loans owed to EDG. The 2021 balance sheet, by contrast, contains a liability for

11

"Secured loan – ED Group" in the amount of $4,183,500—precisely the same amount as the value of WSI's "Intangible Assets" (*i.e.*, the intellectual property).

Wilson prepared both balance sheets. On February 25, 2022, at 2:42 p.m.—in between the creation of the Security Agreement (8:56 a.m.) and the 2021 balance sheet (6:13 p.m.)—Littmann emailed Wilson with the following instructions:

> Please make sure the WSI balance sheet for year ending 2021 reflects a lien against IP in the amount of $4,511,000. This lien is held by Eleanor Dickinson Group. Le[t] me know if you wish more information.

Pl. Exh. 29. Forty minutes later, at 3:23 p.m., Littmann again emailed Wilson and attached the falsified, partially signed Security Agreement and two other documents: a copy of the "Transfer Notice," and a "breakdown" of what EDG was owed. *Id*.

*Transfer Notice*. The attached "Transfer Notice," dated February 15, 2017, purported to give EDG a security interest in agricultural intellectual property owned by WSI. Pl. Exh. 29 at 10. WSI was not a party to the notice, which contained signature blocks only for EDG and IWE. Littmann signed for IWE; Whitt's signature for EDG is absent. The record does not contain a similar document signed by both parties.

The Transfer Notice is nonsensical. It starts by announcing that "the undersigned" (presumably EDG, which did not sign the document) has elected to "transfer" $100,000 in outstanding principal on its SAFE (Simple Agreement for Future Equity) into shares of common stock. "The undersigned" requested that certificates for such shares "be issued in the following names and quantities:". No names or quantities then appear. Instead, that paragraph is followed by this non-sequitur:

> As agreed between the parties, since the agricultural intellectual property is not owned by the "Company", [EDG] will hold a first lien on the agricultural intellectual property owned by [WSI].

The transfer notice concludes by stating that "EDG loan value will earn 100% interest, compounded on the prior year loan balance." What started as a purported conversion of the SAFE into IWE stock ended as an unspecified loan at an unusually high interest rate secured by collateral not owned by the signatory.

12

*Breakdown*. The other attached document, the "Breakdown," is titled, "Money Due to Eleanor Dickson [sic] Group LLC Under Agreement Dated February 15, 2017." The Breakdown purports to show a total debt due to EDG in the amount of $4,511,000:

**Money Due to Eleanor Dickson Group LLC
Under Agreement Dated February 15, 2017**

| Notes | Year | Add Notes | CN Amount | Consideration | Total Due |
|---|---|---|---|---|---|
| 2016 Notes | 2017 | $160,000 | $50,000 | $50,000 | $100,000 |
| | 2018 | $000,000 | $260,500 | $260,500 | $521,000 |
| | 2019 | $67,000 | $521,000 | $521,000 | $1,042,000 |
| | 2020 | $25,000 | $1,109,000 | $1,109,000 | $2,218,000 |
| | 2021 | $25,000 | $2,243,000 | $2,243,000 | $4,486,000 |
| | 2022 | $25,000 | $4,486,000 | $25,000 | $4,511,000 |

The math behind the Breakdown reveals an annual return of 100% on "notes" of $352,000 over six years, consistent with the content of the Transfer Notice.

There is no evidence of outstanding promissory notes totaling $352,000. The only note in the record involving EDG is a $50,000 convertible promissory note executed by WSI and Littmann in favor of EDG dated September 30, 2019. That unsecured note was subject to interest at a "fixed rate of 5.0% per annum." Pl. Exh. 21. Littmann testified in state court that that $50,000 note was the only convertible note outstanding with EDG:

> Q: As you sit here today, do you have any document in your possession, custody, or control that reflects, or totals, or is the basis for the $4.1 million secured loan listed on the [2021 WSI] balance sheet?
>
> A: . . . There was, there were loan documents prepared on each day that a loan was given by The Eleanor Dickinson Group. Only one still remains outstanding.

Pl. Exh. 5 at 74–75. A $50,000 note executed on September 30, 2019, at 5.0% annual interest, would result in a $55,800 obligation at the end of 2021. The $4.1 million obligation on the 2021 WSI balance sheet was falsely inflated by approximately $4.1 million.

13

Littmann explained in an "EDG Background" document he created that EDG initially invested $50,000 into IWE as equity, not debt. He continued: "In early 2017, EDG, IWE and WSI reached an agreement whereby EDG would make more equity infusions into IWE which were secured with a lien on the WSI agriculture technology." Pl. Exh. 8 at 1. In total, Littmann claimed, EDG "invested (did not loan) into IWE $327,500." The figure on the 2021 WSI balance sheet—$4,183,500—is exactly $327,500 less than the number Littmann had provided—$4,511,000—earlier in the day.

Littmann's explanation conflates debt and equity. Convertible promissory notes, like the September 2019 note, are debts that can be secured; but if a note is converted into equity, the debt is extinguished, and it is "black letter law that extinguishing a debt obligation terminates any accompanying security interest" because a security interest "cannot exist independent of the obligation it secures." *Roswell Capital Partners LLC v. Beshara*, 436 F. App'x 34, 35 (2d Cir. 2011); accord *Unisys Finance Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir. 1992). I am not aware of any logical explanation (and nothing appears in the record) as to how EDG could obtain a security interest in WSI's assets through "equity infusions" into IWE. According to Littmann's bankruptcy petition, IWE's stock has "no market value"; EDG's "investments" in IWE are thus now worth precisely $0, not $4.1 million. And nothing explains why investments in *IWE* would serve as the basis for debt owed by *WSI*.

So nothing in the record supports the existence of a security interest. The main document Littmann produced—the Security Agreement—was fabricated in February 2022. The next most probative document—the Transfer Notice—is not signed by the corporation with rights in the collateral (WSI) or the creditor receiving a security interest in the collateral (EDG), and it is nonsensical to boot. The only verifiable note held by EDG—signed in 2019, in the middle of the parties' relationship—does not mention a security interest. Pl. Exh. 21. EDG's debt was not secured and was not for $4.1 million, and the contrary statement on the 2021 WSI balance sheet was false.

Littmann, in an October 2025 affidavit prepared in response to the motion for summary judgment, swears to a "belief and understanding" that EDG "invested/lent approximately $4,831,500 into [WSI] starting in 2016, all of which were corporate debt/equity," in addition to the $50,000 note. Littmann does not say that the debt (or equity) actually existed; he states only that he believes and understands it existed. His belief may be relevant to whether he was justified in directing Wilson to include a phantom $4.5 million secured debt on the WSI balance sheet (see below). But it is not

14

evidence that the secured debt or equity in fact existed. The record contains no evidence from which a reasonable trier of fact could find that the secured debt described in the Breakdown to Wilson ever existed or was outstanding at the time of the email. And there is plenty of evidence suggesting that $4.5 million in secured debt was made up in February 2022 based upon a facile annual doubling of what Littmann considered "equity" investments. Pl. Exh. 8, 29.

Littmann also asserts that a genuine dispute of material fact exists as to the amount of debt owed to EDG. He argues that EDG provided over 7,000 pages of documents in discovery to support its assertion that WSI owed it funds. But none of those documents appears in the record. Littmann's state court testimony that only the $50,000 note remained outstanding stands alone. Littmann cannot benefit from an inference that unspecified evidence not in the record creates a disputed issue of material fact. Before he can benefit from a favorable view of the record evidence, Littmann must first actually place evidence before the Court. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); see also *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[A] *genuine* issue of material fact cannot be conjured out of nothing.").

Besides, the purpose of §727(a)(3) is to ensure the debtor provides "enough information" for creditors and the trustee "to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Juzwiak*, 89 F.3d at 427. The plaintiffs and the Trustee were not required to comb through 7,000 pages from a subpoenaed third party to piece together the basis for the secured debt, especially when Littmann himself testified that only the $50,000 note remained outstanding. See *Connors*, 283 F.3d at 899. Littmann had the duty to make his financial dealings clear. *Juzwiak*, 89 F.3d at 429. If $4.1 million in secured debt actually existed, Littmann should have himself provided documentation to support that fact. See *id.* at 428 ("[C]ourts and creditors should not be required to speculate as to the financial history or condition of the debtor[.]") Indeed, the only reasonable inference one could draw from Littmann's failure to highlight any evidence of a $4.1 million secured debt from those 7,000 pages of discovery is that none exists.

Littmann finally deflects responsibility. He avers that the WSI balance sheet was prepared by Wilson "in the ordinary course of its tax return preparation." Whether that is true or not—Littmann testified in state court that it "could have" been prepared "because of the bankruptcy"—is immaterial. Littmann was the sole director, president, and sole shareholder of WSI. He personally directed Wilson to include a $4.5 million

15

secured debt in favor of EDG on the 2021 WSI balance sheet four hours before its creation. He is responsible under §727(a)(3) for the false information that appeared on the balance sheet at his direction. See *Crawford*, 673 B.R. at 804.

There is no evidence that WSI actually owed EDG $4.1 million as a secured debt at the end of 2021. Littmann testified that only about $50,000 was owed, and the undisputed evidence is sufficient to show that it was not secured by the intellectual property of WSI. The entry on the 2021 WSI balance sheet showing a $4.1 million secured debt to EDG was false, and it was entered at Littmann's direction on February 25, 2022. No rational factfinder could conclude otherwise on this record.

### 3. The trademark and patent recordation forms were falsified.

Whitt forwarded two recordation cover sheets (one for the trademarks, one for the patents), to be filed with the U.S. Patent and Trademark Office, that Littmann signed and returned on March 3, 2022. Both cover sheets list the "Nature of conveyance/Execution date" as the "Security Agreement" dated "February 15, 2017." The cover sheets are both signed by Littmann and dated March 3, 2022. Because the Security Agreement dated February 15, 2017, was in fact fabricated on February 25, 2022, the cover sheets contain false information.

### 4. The EDG lien was falsified.

On March 4, 2022, a UCC financing statement was filed in Delaware on behalf of EDG attesting to its security interest in WSI's intellectual property. But EDG had no security interest in those assets. The documents supporting the purported security interest were either falsified (the Security Agreement) or unexecuted and nonsensical (the Transfer Notice). EDG terminated the financing statement in October 2022. And indeed Littmann does not dispute that EDG had no actual security interest in WSI's intellectual property. He asserts only his "belief and understanding" that such a security interest existed. Again, that may be relevant as to whether Littmann was justified in falsifying recorded information. But it does not negate the fact that the information contained within the UCC financing statement was false. The intellectual property referenced in the financing statement did not in fact secure a debt owed to EDG. Pl. Exh. 9.

Littmann admits that he cooperated with EDG in its preparation of a UCC financing statement and other attempts of EDG to assert a secured position in the assets of WSI. The concession accords with his testimony that he directed or requested that Wilson file the document. Pl. Exh. 4 at 62. He is responsible under §727(a)(3) for falsifying that recorded information.

> **B.     The falsified information was relevant to ascertaining Littmann's financial condition or business transactions.**

Littmann was the sole shareholder of WSI. His equitable interest in WSI was property of the Chapter 7 estate. 11 U.S.C. §541(a). WSI's assets themselves were not property of the estate, but had the bankruptcy trustee discovered that Littmann's equitable interest in WSI was valuable, he could have liquidated the corporation to obtain legal ownership of valuable property held by WSI. See *Fowler v. Shadel*, 400 F.3d 1016, 1018–19 (7th Cir. 2005). So as the Trustee put it, whether a secured debt encumbered WSI's assets was "probably pretty important."

While this adversary case was pending, EDG terminated its false lien and the assets were sold for less than the amount WSI owed to the plaintiffs. The Trustee accordingly abandoned the estate's interest in WSI. In other words, even had a complete and true presentation of WSI's finances been given to the Trustee, the bankruptcy estate could not have recovered any money from WSI. Littmann thus argues that any falsified documents presented to the trustee were immaterial.

His argument is foreclosed by precedent and basic principles of bankruptcy law. It is not for the debtor to determine whether the estate would benefit from a liquidation of his equitable interest in a corporation. That is the trustee's job. 11 U.S.C. §704(a). For the trustee to do his job, the debtor must give him complete and accurate information about his financial affairs. 11 U.S.C. §521(a)(4). Section 727(a)(3) protects the integrity of the bankruptcy system, not the interest of any particular creditor. See *United States v. Gellene*, 182 F.3d 578, 587 (7th Cir. 1999) ("When honesty is absent, the goals of the civil side of the system become more expensive and more illusive."). Thus, "proof of harm is not a required element of a case of action under section 727." *Matter of Smiley*, 864 F.2d 562, 569 (7th Cir. 1989). Falsifying information is not sanctioned by the Bankruptcy Code, regardless of whether it ultimately harms the estate. See *Scott*, 172 F.3d at 968.

17

That observation undermines another of Littmann's arguments. He resists denial of his discharge in the bankruptcy court for his actions as a corporate principal in a "two-party dispute" in state court over WSI's assets. He suggests that the Court defer to the state court "to exercise its contempt powers and otherwise enforce the citations to discover assets." But the falsified documents were produced in bankruptcy, which Littmann invoked the day before the state court could enter a judgment against him for failing to adhere to a consent decree entered after he failed to pay a settlement. Littmann tied up the resources of the Trustee and his creditors by providing falsified information in both courts. His acts threatened the integrity of the bankruptcy system just as much as they thwarted the state court citation process. His argument that the matter belongs only in state court, after he brought it to the bankruptcy court, has no merit.

A true picture of WSI's assets and liabilities was required to ascertain Littmann's financial condition as the sole equity holder of WSI. The falsified documents were recorded information from which the debtor's financial condition and business transactions might be ascertained. On the undisputed facts, the plaintiffs have proven their *prima facie* case.

### C.     Littmann has not produced evidence that would justify his acts.

Because Littmann falsified recorded information, he must show that his acts were justified under all of the circumstances of the case in order to receive a discharge. Littmann has not produced sufficient evidence to permit a reasonable trier of fact to find that his acts were justified, so the plaintiffs are entitled to summary judgment.

The only evidence Littmann produced in response to the motion for summary judgment consists of an affidavit he signed in October 2025. Most of the affidavit addresses the WSI balance sheets for 2019 and 2021. Paragraphs 8, 9, and 10 contain the only statements touching upon Littmann's motives behind the falsified documents:

8.   Exhibit [20] is a true and accurate copy of what was generated by [WSI] and was what its corporate officers believed to be a good faith illustration of the financial status of the company at the end of 2021 as they understood it.

18

> 9. [Littmann] maintains his belief and understanding that [EDG] invested/lent approximately $4,831,500.00 into [WSI] and its related entities starting in 2016, all of which were corporate debt/equity and in addition to the personally guaranteed note obligation of $50,000 that I listed as a personally guaranteed debt in my personal bankruptcy case.
>
> 10. At the time [the 2021 WSI Balance Sheet was created], both myself and Robert Wilson as corporate officers of [WSI] believed that [EDG] held a security interest in intellectual property assets of [WSI] as evidenced by it being listed as a "secured" obligation.

Doc. #95-1. Only the most credulous could believe those paragraphs given every other piece of evidence in the record, but this is summary judgment, so it is not the time for credibility determinations. *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021). The plaintiffs call this a "sham affidavit," but they do not convincingly show that Littmann's averred beliefs are directly contradicted by prior sworn testimony such that I can ignore the affidavit. See *James*, 959 F.3d at 316. If anything, the record shows that Littmann has consistently testified to a belief that EDG was granted a security interest in WSI's IP. So on summary judgment, I accept as true Littmann's statements about his belief and understanding. (I do not consider, on the other hand, the statements about Wilson's purported beliefs. See Fed. R. Civ. P. 56(c)(4) (affidavits require personal knowledge); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc).)

Littmann bears the burden to justify falsifying the documents in this case, and he faces an insuperable obstacle: it is not disputed that he (or someone at his direction) created and falsely *backdated* the Security Agreement. As a matter of law, Littmann's belief that WSI had granted a security interest to EDG does not justify his fabrication of the Security Agreement, the effect of which, through backdating, was to mislead others about the validity of EDG's lien. See *Sloan v. Allen (In re Allen)*, 572 B.R. 440, 459 (Bankr. D.D.C. 2017).

It is one thing, for example, for a person in bankruptcy attempting to reconstruct poorly maintained corporate records to prepare a new document describing past corporate transactions to try to clarify his business transactions for a trustee. See Pl. Exh. 8. It is quite another to fabricate evidence of past corporate dealings in support of a "belief and understanding." I am aware of no case justifying the fabrication of evidence used to file a false lien; most cases on the subject involve prison terms, not discharges.

E.g., *United States v. Center*, 853 F.2d 568, 570 (7th Cir. 1988). A grandson who believes and understands that his grandfather bequeathed him a valuable watch is entitled to explain his belief and understanding to the probate court. He is not entitled to fabricate and backdate a will to present to the probate court in support of his belief. So it is in bankruptcy as well. Falsifying recorded information by fabricating a security agreement before passing off that document as authentic to the trustee is a breach of the debtor's duty to provide complete and accurate information about his financial affairs. It represents an intolerable abuse of the bankruptcy process. Cf. *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 1012 (N.D. Ill. 2005). The penalty must be harsh to deter such abuse. *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985).

It is the debtor's burden to provide evidence that his concealment or falsification of recorded information was justified under all of the circumstances of the case. Against many pieces of evidence suggesting a fraudulent effort to shield assets from his creditors and the Trustee, Littmann offers only that he believed and understood that WSI's assets were encumbered. Bankruptcy judges may have wide discretion in evaluating proffered justifications under §727(a)(3), see *Marx*, 125 F.2d at 336–37, but no reasonable bankruptcy judge could sanction fabricating evidence to support that sort of erroneous belief. See *Lashinsky v. Kresock (In re Kresock)*, No. 19-ap-91, 2020 WL 7133510, at *15 (Bankr. D. Ariz. 2020). Littmann has failed to produce sufficient evidence to justify his acts—a matter on which he bears the burden of proof—so summary judgment must be entered against him. See *Celotex*, 477 U.S. at 322; *UMB Bank, N.A. v. Murphy (In re Murphy)*, No. 18-7050, 2020 WL 6066002, at *15 (Bankr. C.D. Ill. 2020) (GORMAN, J.).

No discharge will be entered in Littmann's bankruptcy case.

# # #